UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

DARREN DEON JOHNSON,

                    Plaintiff,                    Case No. 1:20-cv-1039

v.                                                Honorable Robert J. Jonker

D. STEWART et al.,

                    Defendants.
_____/

## OPINION

This is a civil rights action brought by a state prisoner under 42 U.S.C. § 1983. Under the Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321 (1996) (PLRA), the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief.  28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c).  The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible.  *Denton v. Hernandez*, 504 U.S. 25, 33 (1992).  Applying these standards, the Court will dismiss Plaintiff's complaint for failure to state a claim.  The Court will also deny Plaintiff's pending motion.

## Discussion

### I.      Factual allegations

Plaintiff is presently incarcerated with the Michigan Department of Corrections (MDOC) at the G. Robert Cotton Correctional Facility (JCF) in Jackson, Jackson County,

Michigan.  The events about which he complains, however, occurred at the Muskegon Correctional

Facility (MCF) in Muskegon, Muskegon County, Michigan.   Plaintiff sues MCF Warden Sherry

Burt and Deputy Warden D. Stewart.

   As with dozens of other prisoners who have brought cases in the Western District

of Michigan during the last year, Plaintiff appears to have a legitimate fear of the threat posed by

the ongoing COVID-19 pandemic.  Presumably to validate his concern, he alleges that he has

previously contracted COVID-19.  (*See* ECF No. 1-5, PageID.22.)  In his complaint, Plaintiff seeks

to challenge the response of the two top administrators at MCF, where he was located before he

was moved to JCF.

   Plaintiff alleges that Defendants require that prison staff test for COVID-19 once a

week.  He believes, however, that all staff should be tested daily using rapid testing.  Plaintiff

speculates that a failure to test daily could result in an infected MCF employee working and

transmitting COVID-19 to Plaintiff and other prisoners.  Plaintiff further suggests that Defendants

should lock down units and quarantine all inmates—but not in segregation.  Failing to take these

steps, Defendants have allegedly created an unreasonable risk that resulted in a rise of cases among

prisoners at MCF in September and October 2020.

   Plaintiff seeks declaratory and injunctive relief, $2 million in compensatory

damages, and $500 from each Defendant in punitive damages.

## II. **Failure to state a claim**

   A complaint may be dismissed for failure to state a claim if it fails "'to give the

defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Bell Atl. Corp.*

*v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  While

a complaint need not contain detailed factual allegations, a plaintiff's allegations must include

more than labels and conclusions.  *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678

2

(2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").  The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679.  Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470-71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(i)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996).  Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

III.   **Eighth Amendment**

Plaintiff's allegations do not rise to the level of an Eighth Amendment violation. The Eighth Amendment imposes a constitutional limitation on the power of the states to punish those convicted of crimes.  Punishment may not be "barbarous" nor may it contravene society's

"evolving standards of decency." *Rhodes v. Chapman*, 452 U.S. 337, 345–46 (1981). The Amendment, therefore, prohibits conduct by prison officials that involves the "unnecessary and wanton infliction of pain." *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987) (per curiam) (quoting *Rhodes*, 452 U.S. at 346). The deprivation alleged must result in the denial of the "minimal civilized measure of life's necessities." *Rhodes*, 452 U.S. at 347; *see also Wilson v. Yaklich*, 148 F.3d 596, 600–01 (6th Cir. 1998). The Eighth Amendment is only concerned with "deprivations of essential food, medical care, or sanitation" or "other conditions intolerable for prison confinement." *Rhodes*, 452 U.S. at 348 (citation omitted). Moreover, "[n]ot every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment." *Ivey*, 832 F.2d at 954.

In order for a prisoner to prevail on an Eighth Amendment claim, he must show that he faced a sufficiently serious risk to his health or safety and that the defendant official acted with "'deliberate indifference' to [his] health or safety." *Mingus v. Butler*, 591 F.3d 474, 479–80 (6th Cir. 2010) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (applying deliberate indifference standard to medical claims)); *see also Helling v. McKinney*, 509 U.S. 25, 35 (1993) (applying deliberate indifference standard to conditions of confinement claims).

In a recent case brought by federal prisoners under 28 U.S.C. § 2241, the Sixth Circuit addressed the issue of whether the Bureau of Prisons (BOP) violated the Eighth Amendment rights of medically vulnerable inmates at the Elkton Federal Correctional Institution by failing to adequately protect them from COVID-19 infection. *Wilson v. Williams*, 961 F.3d 829 (6th Cir. 2020). In the opinion, the Sixth Circuit found that the plaintiffs in *Wilson* had easily satisfied the objective component of an Eighth Amendment claim:

> In assessing the objective prong, we ask whether petitioners have provided
> evidence that they are "incarcerated under conditions posing a substantial risk of

4

serious harm." *Farmer*, 511 U.S. at 834. The COVID-19 virus creates a substantial risk of serious harm leading to pneumonia, respiratory failure, or death. The BOP acknowledges that "[t]he health risks posed by COIVD-19 are significant." CA6 R. 35, Appellant Br., PageID 42. The infection and fatality rates at Elkton have borne out the serious risk of COVID-19, despite the BOP's efforts. The transmissibility of the COVID-19 virus in conjunction with Elkton's dormitory-style housing—which places inmates within feet of each other—and the medically-vulnerable subclass's health risks, presents a substantial risk that petitioners at Elkton will be infected with COVID-19 and have serious health effects as a result, including, and up to, death. Petitioners have put forth sufficient evidence that they are "incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834.

*Id.* at 840.

The Sixth Circuit went on to address the subjective prong of an Eighth Amendment claim, noting that the pertinent question was whether the BOP's actions demonstrated deliberate indifference to the serious risk of harm posed by COVID-19 in the prison.

There is no question that the BOP was aware of and understood the potential risk of serious harm to inmates at Elkton through exposure to the COVID-19 virus. As of April 22, fifty-nine inmates and forty-six staff members tested positive for COVID-19, and six inmates had died. "We may infer the existence of this subjective state of mind from the fact that the risk of harm is obvious." *Hope v. Pelzer*, 536 U.S. 730, 738 (2002). The BOP acknowledged the risk from COVID-19 and implemented a six-phase plan to mitigate the risk of COVID-19 spreading at Elkton.

The key inquiry is whether the BOP "responded reasonably to th[is] risk." *Farmer*, 511 U.S. at 844. The BOP contends that it has acted "assiduously to protect inmates from the risks of COVID-19, to the extent possible." CA6 R. 35, Appellant Br., PageID 42. These actions include

implement[ing] measures to screen inmates for the virus; isolat[ing] and quarantin[ing] inmates who may have contracted the virus; limit[ing] inmates' movement from their residential areas and otherwise limit[ing] group gatherings; conduct[ing] testing in accordance with CDC guidance; limit[ing] staff and visitors and subject[ing] them to enhanced screening; clean[ing] common areas and giv[ing] inmates disinfectant to clean their cells; provid[ing] inmates continuous access to sinks, water, and soap; educat[ing] staff and inmates about ways to avoid contracting and transmitting the virus; and provid[ing] masks to inmates and various other personal protective equipment to staff.

*Id.* at 42–43.

The BOP argues that these actions show it has responded reasonably to the risk
posed by COVID-19 and that the conditions at Elkton cannot be found to violate
the Eighth Amendment.  We agree.

Here, while the harm imposed by COVID-19 on inmates at Elkton "ultimately [is]
not averted," the BOP has "responded reasonably to the risk" and therefore has not
been deliberately indifferent to the inmates' Eighth Amendment rights.  *Farmer*,
511 U.S. at 844.  The BOP implemented a six-phase action plan to reduce the risk
of COVID-19 spread at Elkton.  Before the district court granted the preliminary
injunction at issue, the BOP took preventative measures, including screening for
symptoms, educating staff and inmates about COVID-19, cancelling visitation,
quarantining new inmates, implementing regular cleaning, providing disinfectant
supplies, and providing masks.  The BOP initially struggled to scale up its testing
capacity just before the district court issued the preliminary injunction, but even
there the BOP represented that it was on the cusp of expanding testing.  The BOP's
efforts to expand testing demonstrate the opposite of a disregard of a serious health
risk.

*Id.* at 840–41.

In its decision, the Sixth Circuit recognized that other Sixth Circuit decisions have
found similar responses by prison officials and medical personnel, such as cleaning cells,
quarantining infected inmates, and distributing information about a disease in an effort to prevent
spread, to be reasonable.  *Id.* at 841 (citing *Wooler v. Hickman Cnty.*, 377 F. App'x 502, 506
(6th Cir. 2010); *Rouster v. Cnty. of Saginaw*, 749 F.3d 437, 448–49 (6th Cir. 2014); *Harrison v.
Ash*, 539 F.3d 510, 519–20 (6th Cir. 2008); *Rhinehart v. Scutt*, 894 F.3d 721, 740 (6th Cir. 2018).
The *Wilson* Court also noted that other circuits had concluded that similar actions by prison
officials demonstrated a reasonable response to the risk posed by COVID-19:

In *Swain* [*v. Junior*], the Eleventh Circuit granted a stay of a preliminary injunction
pending appeal on state inmates' Eighth Amendment claims.  958 F.3d [1081,]
1085 [(11th Cir. 2020) (per curiam)].  The Eleventh Circuit held that "the inability
to take a positive action likely does not constitute 'a state of mind more
blameworthy than negligence,'" and "the evidence supports that [Metro West
Detention Center ("MWDC")] is] taking the risk of COVID-19 seriously."  *Id.* at
1088–90 (citation omitted).  In response to the pandemic in early March, MWDC
began "cancelling inmate visitation; screening arrestees, inmates, and staff; and
advising staff of use of protective equipment and sanitation practices" and, after
reviewing further CDC guidance, began "daily temperature screenings of all
persons entering Metro West, establish[ed] a 'COVID-19 Incident Command

Center and Response Line' to track testing and identify close contacts with the virus, develop[ed] a social hygiene campaign, and mandate[d] that staff and inmates wear protective masks at all times." *Id.* at 1085–86. The Eleventh Circuit held that, because MWDC "adopted extensive safety measures such as increasing screening, providing protective equipment, adopting [physical] distancing when possible, quarantining symptomatic inmates, and enhancing cleaning procedures," MWDC's actions likely did not amount to deliberate indifference. *Id.* at 1090.

Similarly, the Fifth Circuit granted stays of two preliminary injunctions in *Valentine* [*v. Collier,* 956 F.3d 797 (5th Cir. 2020) (per curiam),] and *Marlowe* [*v. LeBlanc*, No. 20-30276, 2020 WL 2043425 (5th Cir. Apr. 27, 2020) (per curiam)]. In *Valentine*, inmates at Texas's Wallace Pack Unit filed a class action suit against the Texas Department of Criminal Justice ("TDCJ") alleging violations of the Eighth Amendment. 956 F.3d at 799. In response to the COVID-19 pandemic, TDCJ had taken preventative measures such as providing "access to soap, tissues, gloves, [and] masks," implementing "regular cleaning," "quarantin[ing] of new prisoners," and ensuring "[physical] distancing during transport." *Id.* at 802. The Fifth Circuit determined that the district court applied the wrong legal standard by "collaps[ing] the objective and subjective components of the Eighth Amendment inquiry" by "treating inadequate measures as dispositive of the Defendants' mental state" under the subjective prong and held that "accounting for the protective measures TDCJ has taken" the plaintiffs had not shown deliberate indifference. *Id.* at 802–03. In *Marlow*e, the Fifth Circuit relied on its reasoning in *Valentine* and again reiterated that there was "little basis for concluding that [the correctional center's] mitigation efforts," which included "providing prisoners with disinfectant spray and two cloth masks[,] . . . limiting the number of prisoners in the infirmary lobby[,] and painting markers on walkways to promote [physical] distancing," were insufficient. 2020 WL 2043425, at *2–3.

*Wilson*, 961 F.3d at 841–42.

After reviewing the cases, the *Wilson* Court held that even if the BOP's response to COVID-19 was inadequate, it took many affirmative actions to not only treat and quarantine inmates who had tested positive, but also to prevent widespread transmission of COVID-19. The Court held that because the BOP had neither disregarded a known risk nor failed to take steps to address the risk, it did not act with deliberate indifference in violation of the Eighth Amendment. *Id.* at 843–44.

In addition, in *Cameron v. Bouchard,* 818 F. App'x 393 (6th Cir. 2020), the Court relied on *Wilson* to find that pretrial detainees in the Oakland County Jail were unlikely to succeed

on the merits of their Eighth and Fourteenth Amendment claims.  The plaintiffs in *Cameron* claimed that jail officials were deliberately indifferent to the substantial risk of harm posed by COVID-19 at the jail.  The district court initially granted a preliminary injunction requiring the defendants to "(1) provide all [j]ail inmates with access to certain protective measures and medical care intended to limit exposure, limit transmission, and/or treat COVID-19, and (2) provide the district court and Plaintiffs' counsel with a list of medically vulnerable inmates within three business days."  *Id.* at 394.  However, following the decision in *Wilson*, the Court granted the defendants' renewed emergency motion to stay the preliminary injunction, finding that the preventative measures taken by the defendants were similar to those taken by officials in *Wilson* and, thus, were a reasonable response to the threat posed by COVID-19 to the plaintiffs.  *Id.* at 395.  Subsequently, in an unpublished opinion issued on July 9, 2020, the Sixth Circuit vacated the injunction.  *Cameron v. Bouchard*, 815 F. App'x 978 (6th Cir. 2020).

In the instant case, Plaintiff claims that Defendants handling of the COVID-19 crisis violated his Eighth Amendment rights while he was confined at MCF.  The Court notes that the MDOC has taken significant measures to limit the threat posed by COVID-19.[1]  *See* MDOC, *MDOC Response and Information on coronavirus (COVID-19)*, https://medium.com/@Michigan

---

[1] The Court takes judicial notice of these facts under Rule 201 of the Federal Rules of Evidence.  The accuracy of the source regarding this specific information "cannot reasonably be questioned."  Fed. R. Evid. 201(b)(2); *see also* Paul F. Rothstein, *Federal Rules of Evidence* 49 (3d ed. 2019) (citing *Matthews v. NFL Mgmt. Council*, 688 F.3d 1107 (9th Cir. 2012) (taking judicial notice of statistics on the NFL website that the plaintiff played 13 games in California over 19 years); *Victaulic Co. v. Tieman*, 499 F.3d 227, 236–37 (3d. Cir. 2007), as amended (Nov. 20, 2007) (finding error where a district court took judicial notice of facts stated in "a party's . . . marketing material" on an "unauthenticated" website because marketing materials often lack precise and candid information and the source was not authenticated)).  Moreover, "[t]he court may take judicial notice at *any* stage of the proceeding."  Fed. R. Evid. 201(d) (emphasis added).  Thus, the Court may take judicial notice even at this early juncture because the Court is permitted to take judicial notice *sua sponte*, Fed. R. Evid. 201(c)(1), and "the fact is not subject to reasonable dispute," Fed. R. Evid. 201(b).

DOC/mdoc-takes-steps-to-prevent-spread-of-coronavirus-covid-19-250f43144337   (last   visited

Mar. 8, 2021).[2]  These measures include:

**Information on COVID-19 Vaccinations**

Staff COVID-19 Vaccinations began in later Dec. 2020 and employees across the department have now received vaccinations with the help of local county health departments and the Michigan National Guard.

In accordance with MDHHS vaccination strategy, prisoners 65 years and older have previously been offered the vaccine.  Starting on Monday, March 8, facilities will begin offering the vaccine to prisoners who are aged 50 and older with an underlying health condition.

**Personal Protective Equipment, cleaning and mitigation measures**

- Michigan State Industries has produced masks for all prisoners and correctional facility staff to wear.  Each employee and prisoner received three masks each and the masks can be laundered and worn again. Facility staff are also permitted to bring their own PPE, such as masks, gloves and gowns.  Staff are expected to wear their mask during their entire shift and prisoners are expected to also wear their masks at all times, except while eating, sleeping or showering.  Michigan State Industries also manufactured gowns, protective eyewear and protective suits.  Every facility was expected to receive a new order of MSI masks for both prisoners and staff as of late July.  These are made of a lightweight material for use during the summer months.  Prisoners will receive three each and staff will receive three each as well.  FOA and Central Office staff will be receiving new masks as well.

- All MDOC staff transporting a prisoner on or off grounds are required to be dressed in full personal protective equipment (PPE), which is available for those employees.

- All facilities have received approval from the regional sanitation officer to use bleach during facility cleaning.  Facilities have enhanced cleaning efforts and cleaning products are available to clean commonly-used areas and phones before and after use.  Cleaning efforts have been doubled at facilities with vulnerable prisoner populations.  We have increased our production of soap and ensured that all prisoner areas and bathrooms have plentiful access to soap.  Soap has been distributed to prisoners and prisoners have been told that if they need more soap they only need to ask.  Additional soap will be provided at no charge.  CDC posters detailing proper hygiene practices have been posted in correctional facilities and have

---

[2] Although the page is hosted on Medium.com, the MDOC specifically links to this page from their website as the location where they will provide updates and information.  *See* https://www.michigan.gov/corrections/0,4551,7-119-9741_12798-521973--,00.html (last visited Mar. 8, 2021).

also been recreated digitally so they play on TV screens throughout our facilities.  These are the same posters you will see in your community and throughout State of Michigan office buildings.

- Movements have been modified to help facilitate social distancing and the number of prisoners attending classes and meals has been reduced so prisoners can be seated farther apart.  Prisoners and staff are frequently reminded of the need for social distancing and prisoners are instructed not to gather in groups on the yard.  Activities such as basketball and weight pit have been suspended to encourage social distancing, as well.  There are also markers and cones set up for med lines and in the chow hall as a visual reference for prisoners on how far apart they should stand.

- The department has been leading the nation when it comes to consistent testing of the prisoner population.  Following the completion Friday, May 22, of testing prisoners at Michigan Reformatory in Ionia for COVID-19, the Michigan Department of Corrections has completed its goal of testing every prisoner in its system.  Testing also continues daily at our facilities.  When prisoners are set to parole, discharge or other such movements, they are tested again and are not moved until the test results return.

- Staff and visitors can also access information about their facility by signing up for Nixle alerts.   To sign up for Nixle alerts, go to www.michigan.gov/corrections and select the page for the correctional facility in your area to register via the Nixle Widget, or text the zip code of the facility you would like to receive updates from to 888777.

**Visits and Transfers**

- Visitation at facilities statewide was suspended as of March 13[, 2020].

- After suspending visitation at all correctional facilities to protect the health of staff, prisoners, and the public, Director Heidi Washington convened a Visiting Operations Committee to develop recommendations for reactivating prisoner visits.  The committee recommended establishing a pilot project to evaluate the use of video visitation technology and online scheduling of prisoner visits.  The following MDOC Facilities will serve as pilot sites for video visitation: Women's Huron Valley Correctional Facility (WHV); G. Robert Cotton Correctional Facility (JCF); Chippewa Correctional Facility (URF); Richard A. Handlon Correctional Facility (MTU); Ionia Correctional Facility (ICF); Parnall Correctional Facility (SMT); Duane Waters Health Center (DWH).  More information is located in the visitations section of this page below.

- During this time when visits are suspended, we have worked with GTL and JPay to provide enhanced services for you to communicate with your family and friends.  Detailed information from those companies is being relayed to the prisoner population.  JPay is continuing to offer two free stamps per week through April 30, 2021.  GTL's internet and mobile fees are reduced

10

with the regular $2.95 transaction fee reduced to $1.95 and the $1.95 transaction fee reduced to $0.95.

- In connection with visitation suspension, face-to-face college classes at all facilities have also been suspended effective immediately.  The MDOC will work with higher education institutions willing and able to deliver classes as correspondence courses.  Core programming and school classes taught by MDOC staff will continue.

- Outside contractors for substance abuse programming will be allowed inside and will be screened upon entry per the screening protocol.  Attorney visits will continue to be authorized.

- During this time, transfers of prisoners or staff between facilities will not be authorized without the approval of the Assistant Deputy Director or higher.

- The department issued protocol to all county sheriff offices to offer guidance on screening and other preventative measures.

**Quarantine and Care of Sick Prisoners**

- Facility healthcare staff will meet with prisoners who have presented with symptoms of coronavirus.  The MDOC does not make the diagnosis of the coronavirus.  The department is following the Michigan Department of Health and Human Services protocol.

- Prisoners who test positive for the virus are isolated from the general population and any prisoners or staff they have had close contact with are identified and notified of the need to quarantine.

- Prisoners who test positive may be transferred to the department's designated quarantine unit at Carson City Correctional Facility.  This unit is completely separated from the main facility, has limited movement and access to the unit is limited.  Only a small number of designated staff work in the unit in 12-hour shifts to limit the number of people entering.  Those staff members report directly to the unit and do not enter the main correctional facility.  Prisoners transferred to the unit also stay on the unit and do not enter any other areas of the prison.

- Prisoners who have been identified as having close contact with another prisoner who tests positive, but have not tested positive for the virus themselves, will be isolated from the general population at their facility for the 14-day quarantine period.

- Co-pays for prisoners who need to be tested for COVID-19 have been waived.

- Prisoners have been urged to notify healthcare if they are sick or experiencing symptoms of illness so they can be evaluated.  Prisoners who require outside medical attention will be transported to an area hospital for treatment.

11

- Prisoners are considered in step-down status when they no longer have symptoms, are no longer considered contagious and have been medically cleared by our chief medical officer.

**Parole Information**

- The MDOC Parole Board continues to hold parole hearings and is reviewing all eligible cases to determine prisoners who can be safely released at this time.  In addition, the department is holding remote public Parole Board hearings for parolable life sentence and clemency cases.  You can find more information on scheduled hearings and how to participate here.

- The department continues to review individual cases and the Parole Release Unit is working to process parole releases for prisoners with positive parole decisions as quickly and safely as possible.

- We are no longer allowing parole representatives to enter correctional facilities for parole hearings as an additional step to limit the potential introduction of illness.  However, individuals designated by a prisoner as [] parole representatives should contact the facility where the prisoner is being housed to find out about options to call in for the hearing.

- The Parole Board is aware that prisoners do not have access to certain programming and the Board is taking that into consideration.  If there are changes in the prisoner's case, the prisoner will be notified directly.

- We continue to monitor the prisoner population, our parole and probation population and the parole process as this pandemic continues, in order to consider all options to ensure the safety of offenders under our supervision.

- All of our paroles are done with public safety in mind.  The Parole Board looks at each individual on a case-by-case basis and will only grant a parole if they believe that person will not be a harm to society.

- All prisoners set to parole must take a COVID-19 test before being released.  The MDOC is working to expedite the parole release of those individuals who can safely and legally be released at this time.  There are a number of steps that are included in the parole release process, which now includes testing for COVID-19 to ensure the individual will not pose a risk to loved ones or the community upon release.  As a result, a limited number of parole dates may be changed to accommodate these processes.  If a prisoner tests positive they will not parole until they are cleared by healthcare, which is at least 14 days from the onset of symptoms.  Prisoners who test negative will be paroled as scheduled.

**Staff Measures and Information**

- The need for social distancing to help prevent the spread of this virus has included asking organizations to have as many people telecommute as possible, and the MDOC is doing that to the extent we can.  Employees

should have been authorized to telecommute by their supervisor and supervisors who have questions should contact their leadership. No employees who have been ordered to telecommute should return to their work site unless authorized to do so by their deputy director or Director Washington. Employees who are telecommuting should complete required online training during this time.

- ALL correctional facility employees continue to report to work. Our facilities need to continue operating as close to normal as possible for the safety of those both outside and inside the institution. We need to continue to keep those incarcerated engaged and occupied in a productive manner to ensure the stability, safety and security of our facilities. Thank you to our correctional facility staff for all they do to keep the citizens of our state safe.

- Anyone entering facilities will be subject to enhanced screening prior to entering. This includes answering screening questions and having their temperatures taken. Anyone suspected of having symptoms will not be allowed in the facility.

- The Michigan Correctional Officers' Training Council has supported the Department's request to extend the period for obtaining necessary college credits to 24 months from date of hire. Officers who are deficient in their college credits will now have 24 months from their date of hire to complete the required college credits, rather than 18. This change allows officers extra time during this period of uncertainty.

- As the state works to limit the spread of the virus, we caution employees not to let fear lead to discriminatory actions against any individuals based on their disability, race or ethnicity. If you have experienced or witnessed discriminatory harassment or discrimination, we want you to know it will not be tolerated and we strongly encourage you to report it by calling the MDOC Equal Employment Opportunity Office at 1–800–326–4537, 517–335–3654, or by contacting MDOC EEO Officer Toya Williams at 517–335–4125 or williamst8@michigan.gov.

- The department's corrections officer training academies will now be starting again with social distancing measures and enhanced cleaning and sanitizing efforts in place.

- The Department of Health and Human Services issued an emergency public health order on Aug. 19 requiring COVID-19 testing of all staff at any facilities that have a positive staff or prisoner case. Employees must continue to obtain testing weekly until 14 days after the last confirmed positive case at the facility. Employees can receive testing in the community or utilize the free, on-site testing the MDOC will provide each week the order applies at a facility.

- The Department of Health and Human Services issued an emergency public health order on Feb. 10 requiring daily testing of all employees and

prisoners at a facility where an outbreak of special concern has been declared for at least 14 days.

**Operational Changes**

- Corrections Transportation Officers or other department staff will be reassigned to facilities to augment custody staff as determined by Assistant Deputy Directors.

- No out-of-state business travel will be allowed until further notice.  All in-state business travel should be for essential matters only and precautions, including wearing a mask, should be used if traveling with others in the same vehicle.

- Most construction projects have been placed on hold.  Each project will be evaluated on a case-by-case basis.

- Staff are encouraged to use phone calls, email and teleconferencing in place of in-person meetings when possible.  Any necessary in-person meetings should be limited as much as possible and the size of the meeting should be reduced to allow for attendees to stay the recommended 6-foot distance apart.

*Id.*  Further, the MDOC issued a COVID-19 Director's Office Memorandum (DOM) on April 8, 2020, and issued multiple revised DOMs on the subject.  *See* MDOC DOM 2020-30R2 (eff. May 26, 2020) (outlining specific precautions to be taken by staff members, including the use of personal protective equipment and hand sanitizer); MDOC DOM 2020-30R3 (eff. May 27, 2020); MDOC DOM 2020-30R4 (eff. Aug. 10, 2020); MDOC DOM 2020-30R5 (eff. Aug. 25, 2020); MDOC DOM 2020-30R6 (eff. Aug. 27, 2020); MDOC DOM 2020-30R7 (eff. Nov. 5, 2020); MDOC DOM 2020-30R8 (eff. Nov. 24, 2020); MDOC DOM 2021-26 (eff. Jan. 1, 2021); MDOC DOM 2021-26R (eff. Jan. 12, 2021); MDOC DOM 2021-26R (eff. Jan. 12, 2021); MDOC DOM 2021-26R2 (eff. Jan. 21, 2021); MDOC DOM 2021-26R3 (eff. Jan. 25, 2021); MDOC DOM 2021-26R4 (eff. Mar. 5, 2021).  The DOMs set forth specific details about protective measures to be taken in all facilities:  describing the types of PPE to be worn by staff and when; setting screening criteria for individuals entering facilities; setting social distancing requirements; establishing isolation areas and practices for isolation; setting practices for managing prisoners

14

under investigation for COVID-19; modifying how personal property is managed; setting requirements for jail transfers; outlining communication adjustments and video visitation; upgrading hygiene, health care, and food service policies, setting protocols for COVID-19 testing of prisoners; and making other necessary adjustments to practices to manage the pandemic.  Thus, the MDOC recognized the need to adjust practices and implemented those practices by way of policy.

Clearly, the MDOC and its wardens have taken extensive steps to address the risk of COVID-19 to inmates statewide.  As noted by the Sixth Circuit in *Wilson*, such actions demonstrate the opposite of a disregard of a serious health risk.  *Wilson*, 961 F.3d at 841. Therefore, Plaintiff cannot demonstrate that Defendants were deliberately indifferent to his medical needs.

Moreover, Plaintiff's assertions that Defendants must test all staff every day appear misplaced.  Perhaps Plaintiff labors under the false impression that COVID-19 testing kits have been readily available.  That is not the case.  The nation faced several shortages of testing kits during the fall months.  *See*, GAO, *COVID-19: Urgent Actions Needed to Better Ensure an Effective Federal Response*, https://www.gao.gov/products/gao-21-191 (last visited Mar. 11, 2021) ("In September 2020, GAO reported that ongoing constraints with the availability of certain types of personal protective equipment (PPE) and testing supplies remain due to a supply chain with limited domestic production and high global demand.  In October 2020, GAO surveyed public health and emergency management officials from all states . . . and found . . . about one-third to one-half [of states] reported shortages in . . . testing supplies.")[3]

---

[3] Notwithstanding the Court's ability to take judicial notice of these facts under Rule 201 of the Federal Rules of Evidence, the information in this paragraph plays no role in the Court's decision.  Instead, this information merely provides context and additional information to a prisoner who is incarcerated amidst an ongoing

Although the Court is sympathetic to Plaintiff's general concern about the COVID-19 virus, he has failed to allege facts showing that Defendants' handling of the COVID-19 crisis violated his Eighth Amendment rights.  Accordingly, the Court will dismiss his Eighth Amendment claims.

IV.     **Respondeat Superior**

To the extent that Plaintiff alleges that Defendants did not ensure adequate enforcement of the MDOC DOMs, Plaintiff fails to state a § 1983 claim for an additional reason. Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior or vicarious liability.  *Iqbal*, 556 U.S. at 676; *Monell v. New York City Dep't of Soc. Servs*., 436 U.S. 658, 691(1978); *Everson v. Leis*, 556 F.3d 484, 495 (6th Cir. 2009).   A claimed constitutional violation must be based upon active unconstitutional behavior.  *Grinter v. Knight*, 532 F.3d 567, 575–76 (6th Cir. 2008); *Greene v. Barber*, 310 F.3d 889, 899 (6th Cir. 2002).  The acts of one's subordinates are not enough, nor can supervisory liability be based upon the mere failure to act.  *Grinter*, 532 F.3d at 576; *Greene*, 310 F.3d at 899; *Summers v. Leis*, 368 F.3d 881, 888 (6th Cir. 2004).  Moreover, § 1983 liability may not be imposed simply because a supervisor denied an administrative grievance or failed to act based upon information contained in a grievance.  *See Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999).  "[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  *Iqbal*, 556 U.S. at 676.  Plaintiff has failed to allege that Defendants engaged in any active unconstitutional behavior.  Accordingly, he fails to state a claim against them.

---

deadly pandemic.  *C.f. United States v. Mathews*, No. 20-1635, slip op. at 2 n.3 (6th Cir. Mar. 8, 2021), https://www.opn.ca6.uscourts.gov/opinions.pdf/21a0119n-06.pdf.

V.      **Pending Motion**

Plaintiff also has a pending motion requesting a temporary restraining order and preliminary injunction.  (ECF No. 3.)  In light of the Court's dismissal of the complaint, the Court will deny Plaintiff's motion as moot.

## <u>Conclusion</u>

Having conducted the review required by the Prison Litigation Reform Act, the Court determines that Plaintiff's complaint will be dismissed for failure to state a claim, under 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c).  The Court will also deny Plaintiff's pending motion.  The Court must next decide whether an appeal of this action would be in good faith within the meaning of 28 U.S.C. § 1915(a)(3).  *See McGore v. Wrigglesworth*, 114 F.3d 601, 611 (6th Cir. 1997).  Although the Court concludes that Plaintiff's claims are properly dismissed, the Court does not conclude that any issue Plaintiff might raise on appeal would be frivolous. *Coppedge v. United States*, 369 U.S. 438, 445 (1962).  Accordingly, the Court does not certify that an appeal would not be taken in good faith.  Should Plaintiff appeal this decision, the Court will assess the $505.00 appellate filing fee pursuant to § 1915(b)(1), *see McGore*, 114 F.3d at 610-11, unless Plaintiff is barred from proceeding *in forma pauperis*, *e.g.*, by the "three-strikes" rule of § 1915(g).  If he is barred, he will be required to pay the $505.00 appellate filing fee in one lump sum.

This is a dismissal as described by 28 U.S.C. § 1915(g).

An opinion and judgment consistent with this opinion will be entered.


Dated:   __March 16, 2021__          /s/ Robert J. Jonker
                                      ROBERT J. JONKER
                                      CHIEF UNITED STATES DISTRICT JUDGE